**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

MADELINE FELDMAN,

                          Plaintiff,

    -against-

MIND MEDICINE, INC.

                         Defendant.

Case No. 23-cv-6169-LGS

**COMPLAINT**

PLAINTIFF MADELINE FELDMAN, by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff Madeline Feldman ("Plaintiff") withstood years of unequal pay and harassment by a "boy's club" of executives who exploited her extraordinary efforts and her good faith, with promises of pay equity. Then, when she was diagnosed with a brain tumor requiring treatment and a medical leave of absence, Defendant Mind Medicine, Inc. ("Defendant MindMed") retaliated against her for engaging in protected activity by changing her job and ignoring its promises in an attempt to get her to quit. Respondent MindMed ultimately terminated her employment in a pretextual "corporate realignment" that only affected one other employee, who was also disabled.

2.    Plaintiff, a female resident of Texas, brings this complaint against Defendant MindMed to remedy discrimination against her in the terms and conditions of her employment because of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d

et seq., and the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d); the New York Equal Pay Act ("NYEPA"), NY Labor Law § 194; New York State Human Rights Law ("NYSHRL"), NY Exec. Law § 290; New York City Human Rights Law ("NYCHRL"), NYC Admin. Code § 8-106; defamation; and retaliation for opposing Defendant MindMed's unlawful activities.[1]

## THE PARTIES

3.      At all relevant times, Plaintiff was Defendant MindMed's "employee" within the meaning of the pertinent federal, state, and local law.

4.      Defendant MindMed is a corporation organized under the laws of the state of Delaware with a principal place of business in New York, New York.

5.      At all relevant times, Defendant MindMed was Plaintiff's "employer" within the meaning of pertinent federal, state, and local law.

## JURISDICTION

6.      The United States District Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims include questions of federal law. The United States District Court has pendant jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

7.      The United States District Court for the Southern District of New York can exercise personal jurisdiction over Defendant MindMed because its principal place of business in the United States is located in New York County, New York.

---

[1] On May 30, 2023, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunities Commission alleging violations of Title VII of the Civil Rights Act of 1964. In addition, some of the facts set forth herein are also predicate facts to Plaintiff's complaint for retaliation in violation of the Sarbanes-Oxley Act of 2002, filed with the Occupational Safety and Health Administration on May 30, 2023.

8.     Venue is proper in the Southern District of New York because Defendant MindMed's principal place of business in the United States is located in New York County, New York, and many of the acts about which Plaintiff complains occurred in New York County.

## FACTUAL BACKGROUND

9.     Plaintiff started working for Defendant MindMed as a consultant in June 2019. In April 2020, she became one of Defendant MindMed's first full-time employees. Her title was Director of Administration & Operations. Later, her title became Director of Strategy and Operations, and then Chief of Staff to Chief Business Officer/Chief Technology Officer Bradford Cross ("CBO/CTO Cross").

10.     From 2019 to 2022, Plaintiff devoted herself completely to the launch and growth of Defendant MindMed. She worked side-by-side with the founders/co-chief executive officers Jamon A. Rahn ("CEO Rahn") and Stephen Hurst ("CEO Hurst") to launch the organization. During her tenure, Ms. Feldman helped take the company public, scale the team to about 75 full-time employees, and lead the team through several changes in leadership. Her roles in both business development and operations had a significant impact within the organization.

11.     CEO Rahn operated Defendant MindMed like a "boy's club." His friends – all male – were overpaid, over-leveled, abusive, frequently incompetent, and untouchable. Female employees worked far more challenging jobs at lower levels and for less pay. All complaints about CEO Rahn's "boy's club" fell on deaf ears and were not investigated.

## Defendant MindMed Asks Plaintiff to Move to NYC

12.     Shortly after Plaintiff started working for MindMed, MindMed asked her to relocate to New York City and to open and staff MindMed's U.S. headquarters. She scheduled a trip to NYC to look at commercial real estate, but the COVID-19 pandemic prevented her trip.

13.     Even as travel restrictions loosened up, MindMed continued to represent that it wanted Plaintiff to work from its New York City office. Her relocation was further delayed as MindMed changed her job responsibilities.

**MindMed Paid Women Less Than It Paid Men**

14.     Ms. Feldman achieved high success and praise for her work from her superiors and colleagues. Despite this, Defendant MindMed willfully and intentionally paid Plaintiff less than her male colleagues with substantially equal jobs. The pay discrepancy between Plaintiff and her male counterparts was pervasive throughout all aspects of compensation including salary and awards of highly-valuable stock options and Restricted Stock Units ("RSUs"). In addition, among those employees who performed work at an equal level of responsibility and tenure at the company, Defendant MindMed systematically gave the males more prestigious titles and promotion opportunities than it gave women, including Plaintiff.

15.     In October 2020, MindMed hired a female director in the operations department ("Female Director 1"). CEO Rahn only authorized Plaintiff to offer a salary of $80,000 even though Female Director One had more experience than her male coworker ("Male Coworker 1), who earned $120,000. Plaintiff questioned whether $80,000 was an appropriate salary for Female Director 1, since she would be working in New York City. CEO Rahn responded that Defendant MindMed did not offer pay differentials for geographic costs of living. In what would become a common theme at MindMed, CEO Rahn promised Female Director 1 a raise several times, before ultimately terminating her position.

16.     Plaintiff discussed the pay disparity with Chief Operating Officer Carol Nast ("COO Nast"). COO Nast confirmed her knowledge of CEO Rahn's sexist behavior but he and the other the men who made compensation decisions were not interested in pay equity. Thus, CEO

Rahn's sexist behavior did not change. Defendant MindMed eventually offered Female Director 1 $90,000, narrowing the pay gap between Female Director 1 and Male Coworker 1 to $30,000.

**Male Coworker 1 Defames Plaintiff With Baseless Claim of Sexual Harassment and
Defendant MindMed Allows Him to Engage in Sexist Bullying and Harassment**

17.     In July 2020, Male Coworker 1 made an unsubstantiated and baseless gender discrimination claim against Plaintiff. Male Coworker 1 told Plaintiff that she made him uncomfortable and that he would only communicate with her by email going forward. This was problematic as Defendant MindMed employees communicated primarily via telephone, text, and Microsoft Teams.

18.     Male Coworker 1 published his unsubstantiated and baseless gender discrimination claim as part of his job for Defendant MindMed and while performing work for Defendant MindMed. Upon information and belief, Male Coworker 1 published his untrue gender discrimination claim to individuals other than Plaintiff.

19.     Plaintiff, ever mindful of her obligation to Defendant MindMed, reported the alleged gender discrimination against her to CEO Hurst and COO Nast. Plaintiff wanted to clear her own name because her professional reputation was called into question by Male Coworker 1's complaint.

20.     Plaintiff recommended that Defendant MindMed mediate Male Coworker 1's claim against Plaintiff because it was vital that they recommence communicating through normal channels. For the remainder of 2020 and 2021, however, Male Coworker 1 blocked Plaintiff on all forms of communication except email, and was largely unresponsive to Plaintiff when she emailed.

21.     As a result of the stress associated with enduring Male Coworker 1's torment and harassment, Plaintiff gained 30 lbs, her hair started falling out, she started seeing a therapist, and she was diagnosed with anxiety and depression. By refusing to rectify Male Coworker 1's baseless

sexual harassment claims, Defendant MindMed forced Plaintiff to suffer the psychological effects of his torment.

22.     In the course of Defendant MindMed's investigation, Male Coworker 1 informed CEO Rahn that he complained about Plaintiff's behavior because Plaintiff sent him a message with a "wink face" emoji, Male Coworker 1's girlfriend saw it, and his girlfriend became angry. Simply, Male Coworker 1 defamed and harassed Plaintiff, tarnishing her professional reputation, and interfered with her ability to do her job, because she is a woman and Male Coworker 1's girlfriend did not like that he worked with women.

23.     Male Coworker 1 knowingly published the untrue statement that Plaintiff made him feel uncomfortable.

24.     Defendant MindMed took no action against Male Coworker 1 for knowingly making a sexual harassment claim without a good faith basis, or his baseless and purposeful interruption of the workflow at Defendant MindMed. Instead, Defendant MindMed allowed Male Coworker 1 to publish his false allegations and harm Plaintiff's professional reputation without any accountability for his lies.

25.     Defendant MindMed did not instruct Male Coworker 1 to unblock Plaintiff or to respond to her emails. It did not demand that Male Coworker 1 retract his false statements. As a result, through the end of 2020 and 2021, Male Coworker 1 only unblocked Plaintiff if he needed something from her, and then reblocked her after she delivered.

26.     Defendant MindMed implicitly endorsed Male Coworker 1's defamatory statements by failing to stop him. In short, Defendant MindMed discriminated against Plaintiff because of her sex by ensuring that she suffered a hostile work environment from Male Coworker 1's continued harassment.

6

**Defendant MindMed "Relevels" Its Positions,
<u>Supposedly to Normalize Titles and Pay Rates</u>**

27.     In 2021, Defendant MindMed "re-leveled" many of its positions to make titles,

seniority levels, and pay rates uniform across the organization in combination with the integration

of a recently acquired company. For example, under the new leveling system, everyone with the

title "vice president" would have equal responsibility and receive equal compensation. These so-

called "L-levels" were internal to Defendant MindMed and were meant to guide compensation and

career trajectory within the company.

28.     Male Coworker 1 and a second male coworker ("Male Coworker 2") were re-

leveled to L4, while Plaintiff was re-leveled to the more prestigious L5. This meant Plaintiff's role

entailed greater skills, effort, and responsibility than those of Male Coworker 1 or Male Coworker

2. Despite that, Defendant MindMed consistently paid Plaintiff significantly less than it paid Male

Coworker 1 and Male Coworker 2.

29.     Specifically, Plaintiff's employment started with a significantly lower base salary

than Male Coworker 1 and Male Coworker 2. Plaintiff's starting salary was $100,000, whereas

Male Coworker 1 and Male Coworker 2 earned $120,000 and $150,000, respectively.

30.     Further, Defendant MindMed inequitably granted more stock options to men than

women. Defendant MindMed granted Plaintiff 120,000 employee stock options, whereas it granted

Male Coworker 1 and Male Coworker 2 300,000 and 450,000, respectively. Moreover, in August

of 2020, Defendant MindMed hired an entry-level male analyst and awarded him more stock

options than Defendant MindMed awarded Plaintiff, a senior leader.

31.     Finally, Plaintiff was eventually bucked back down to the L5 level of Director, after

her promotion to Senior Director (L6) had been announced organization-wide. Notwithstanding

the Level Defendant MindMed assigned to her, she performed L7 work and received exemplary

performance feedback. Conversely, Male Coworker 1 and Male Coworker 2 enjoyed L7 management titles – vice president – and received higher pay than Plaintiff, while performing L4 work.

**Defendant MindMed Acknowledges that Plaintiff is
Under-Leveled and Underpaid, Yet Delays Her Promotion and Equity Grant**

32.    In July 2020, CEO Rahn informed Plaintiff that she was under-leveled, overperforming, and needed a raise and more equity. Defendant MindMed delayed for five months before taking any action upon CEO Rahn's pronouncement. Even so, Defendant MindMed reneged on what little action it took.

33.    In October 2020, CEO Hurst and COO Nast discussed a potential raise and promotion with Plaintiff, but declare that tension between the co-CEOs made it an inopportune time for the board of directors to approve her raise and promotion.

34.    In December 2020, CEO Rahn conferred several title promotions. He promoted Male Coworker 1 several levels to vice president, Male Coworker 2 to vice president, and Plaintiff to Senior Director. The promotions themselves were discriminatory – CEO Rahn granted more senior titles to the male employees than he granted Plaintiff, even though the males had less responsibility than Plaintiff. Defendant MindMed promised Plaintiff a raise and increase in equity along with her promotion, but never fulfilled its promise. By mid-2021, MindMed reversed Plaintiff's title promotion.

**Plaintiff and Others Complain About
Pervasive Sex Discrimination at Defendant MindMed**

35.    In or about January 2021, Defendant MindMed engaged an "Independent Consultant" to perform a 360-degree review of CEO Rahn to help determine whether he should continue in his role as CEO. The interviews were supposed to be confidential, so Plaintiff, Female

Director 1, and COO Nast disclosed sex discrimination and harassment, and other questionable behavior, by CEO Rahn and other members of the boys club.

36.     Specifically, Plaintiff complained about the "boy's club," sex discrimination including unfair treatment and unequal pay, governance concerns, self-dealing concerns, and other matters. Plaintiff also raised these concerns with CEO Hurst and COO Nast several times over the course of the year leading up to the 360-degree review.

37.     Unfortunately, the "Independent Consultant," was a close friend and coach of a member of Defendant MindMed's Board of Directors. The board member was a close ally of CEO Rahn. Upon information and belief, the Independent Consultant did not maintain the confidentiality of the information shared with her during the 360-review and the information was shared with CEO Rahn. Indeed, the Independent Consultant did not even have a nondisclosure agreement in place to protect Defendant MindMed's confidential information.

38.     Shortly after being interviewed by the Independent Consultant, Defendant MindMed terminated the employment of both Female Director 1 and COO Nast. CEO Rahn's behavior towards Plaintiff suffered a marked change. He began avoiding meetings with Plaintiff and avoiding further discussion about increasing her salary and equity. This behavior continued until CEO Rahn "stepped down" from his CEO role in early June 2021. By June or July 2021, Defendant MindMed demoted Plaintiff from Senior Director to Director without cause.

39.     Upon information and belief, Plaintiff's employment was not terminated after the interview with the Independent Consultant because Plaintiff was providing a massive value for Defendant MindMed. For example, she was leading the integration of MindMed and a recently-acquired company, as well as overseeing several functional areas. Replacing Plaintiff with someone earning an equitable compensation package would be costly.

**Defendant MindMed Completes An Acquisition**
**And Plaintiff's Reporting Structure Changes**

40.      In the first quarter of 2021, Defendant MindMed completed a significant acquisition. Plaintiff worked on the integration of the two companies and was to be assigned to report to chief medical officer Dan Karlin ("CMO Karlin"). Plaintiff soon realized that CMO Karlin was dismissive of women, so she maneuvered to report to CBO/CTO Cross instead.

41.      CMO Karlin showed his true colors in July 2021, when Plaintiff presented a high-level diversity initiative pitch to executives on a senior operations call. Ever dismissive of women, CMO Karlin interrupted Plaintiff, stating, "I don't need diversity training to teach me not to sexually harass someone." It was clear that neither he nor the interim chief executive officer Rob Barrow ("CEO Barrow), would support a diversity initiative in any meaningful way. Accordingly, Plaintiff pressed "pause" on instituting a formal diversity initiative until Defendant MindMed had a permanent chief executive officer.

42.      Even without a formal diversity initiative, Plaintiff took steps to improve diverse representation at Defendant MindMed. In the Fall of 20221, under Plaintiff's leadership as interim Head of Talent, Defendant MindMed hired two high-caliber, diverse women into senior leadership positions. Upon information and belief, Defendant MindMed has not hired a single diverse woman into a leadership position since then. In fact, Defendant MindMed has not hired a single woman into a leadership position in the last year, despite making several senior-level hires in 2023. Plaintiff also included discussions of diversity, equity, and inclusion at a strategic offsite meeting she planned for Defendant MindMed's leaders.

**Defendant MindMed Incorporates Defined Job Levels;**
**Plaintiff Remains Under-Leveled and Underpaid**

43.     In June or July 2021, Defendant MindMed completed its "re-leveling" project. Male Coworker 1 and Male Coworker 2 were re-leveled to L4, while Plaintiff was re-leveled to the more prestigious L5. Even though she objectively performed more sophisticated work than Male Coworker 1 and Male Coworker 2, Plaintiff's title promotion was reversed while Male Coworker 1 and Male Coworker 2 kept their new L7 vice president titles.

44.     The inequity was so stark that at one point Defendant MindMed suggested that Male Coworker 2 <u>report to</u> Plaintiff, even though his title was higher than hers. Both Male Coworker 1 and Male Coworker 2 continued to earn more than Plaintiff. When Male Coworker 1 resigned to return to school, Defendant MindMed granted him an outrageous exit package, including accelerated equity and an additional grant of equity.

45.     In August 2021, Defendant MindMed hired a male coworker ("Male Coworker 3") to take over many of Plaintiff's IT responsibilities. Male Coworker 3 was paid significantly more than Plaintiff and received a higher equity grant, consisting of both stock options and RSUs, even though Male Coworker 3 was not responsible for managing a staff and reported to a vice president. By contrast, Plaintiff managed staff, directed work across several functions, and reported to the chief business officer/chief technology officer.

**Defendant MindMed Withholds Plaintiff's Restricted Stock Units**

46.     Having worked at Defendant MindMed since 2020, Defendant MindMed granted Plaintiff 50,000 Restricted Stock Units ("RSU") as retention grant and in recognition of her excellent performance.  The RSUs were supposed to vest monthly beginning in April 2021. Due to "administrative issues," Plaintiff's RSUs were not issued until 2022, and she had no access or

ability to sell her RSUs until August 2022, during which time the stock price dropped significantly. Upon information and belief, male employees did not suffer the same "administrative issues."

**Plaintiff Continues to Complain About**
**Gender Discrimination, Lack of Diversity, And Suffers Retaliation**

47.     Throughout the Fall of 2021, Plaintiff continued to advocate for women and diverse leaders at Defendant MindMed. In October 2021, she learned that CMO Karlin and CEO Barrow were planning to film a corporate video at an offsite meeting she planned in New York. As originally conceived, the video would only feature white male leaders. Plaintiff intervened and succeeded in having them include female leaders and a diverse team that better represented the U.S.-based team and all patients that MindMed claimed to want to help. Plaintiff intervened on a regular basis to push for more diverse representation and opportunity, including in 2022 when MindMed was applying to present a panel of all white men at the South by Southwest conference.

48.     At an October 2021 meeting in New York City, Plaintiff ran a session with non-executive staff where they could provide feedback concerning a variety of topics, including discrimination. Plaintiff compiled the information she gathered that concerned executive-level action and provided it to Defendant MindMed's executives. Upon information and belief, Defendant MindMed still has not done anything to address the issues raised in this session.

49.     Plaintiff continued to have conversations with executives concerning her unfair compensation package. In an October 13, 2021 conversation with board member and former CEO Hurst, he asked, "You have at least a million shares, right?" In fact, she had less than half that amount. A few days later, on October 16, 2021, in a conversation among Charging Party, CBO/CTO Cross, former CEO Hurst, and an executive consultant, CEO Hurst informed CBO/CTO Cross that he was empowered to fix the historical inequity in Plaintiff's compensation.

50.     Upon information and belief, the senior-most leaders at Defendant MindMed resented Plaintiff's work advocating for diverse employees and her opposition to her own pay inequity. Upon information and belief, they considered her as meddling in their work. Accordingly, Defendant MindMed's leaders retaliated against Plaintiff.

51.     CBO/CTO endeavored to fix the historical inequity in Plaintiff's compensation by promoting Plaintiff to Chief of Staff and promising that her salary, equity grant, and level would be corrected by the first quarter of 2022. Cross also notified HR and CEO Barrow of his intention to give an additional bonus to Plaintiff in recognition of her valuable contributions in 2021.

52.     Notwithstanding CEO Hurst's representations, CBO/CTO Cross's efforts were stopped by human resources and CEO Rob Barrow. Defendant MindMed failed to effectuate CBO/CTO's changes. The pay gap was never fixed.

53.     As Plaintiff oversaw US People Operations, she had access to the company's human resources information system ("HRIS") and could see employee compensation and levels. She noticed that CMO Karlin paid his two direct reports very differently, despite having identical job titles and substantially equal jobs. Specifically, CMO Karlin paid significantly less to a Black, female, medical doctor who had tenure with the company than he paid a white, male, non-medical doctor, despite the company's policy to pay medical doctors more than it paid non-medical doctors. CMO Karlin responded by forwarding the email to CEO Barrow and CBO/CTO Cross, asking if pay equity was "in [Plaintiff's] lane."

54.     Plaintiff also raised her concerns to multiple employees within the company's human resources team. The pay gap was never fixed. Upon information and belief, Defendant MindMed continues to pay males more than females for equal work, across all levels of senior leadership.

13

55.     Shortly after complaining about her own pay inequity and that of the Black female doctor reporting to CMO Karlin, Plaintiff's access to salary information and most of the HRIS was blocked.

56.     CBO/CTO Cross, recognizing the discrimination against Plaintiff and Defendant MindMed's willful promotion of inequitable pay structures, advised Plaintiff to leave Defendant MindMed. He even introduced Plaintiff to potential new employers.

57.     Upon information and belief, the refusal to effectuate her raise and the restriction of her access to the HRIS were willful and retaliatory because she pushed Defendant MindMed to provide equitable pay to all employees, including herself.

**Plaintiff Takes Medical Leave and Suffers Retaliation**

58.     From late December 2021 to early February 2022, Plaintiff took short-term disability leave for treatment of a brain tumor and long COVID. During her leave, CBO/CTO Cross's employment was terminated. When she returned to work, Plaintiff's job was completely changed.

59.     Knowing that Plaintiff did not wish to work in IT, Defendant MindMed assigned Plaintiff to build out the Data Compliance & Security Department, reporting to the vice president of Global Operations, Jakub Klimes ("VP Klimes"). This role was the opposite of Plaintiff's skillset. All of her previous responsibilities had been reassigned. Her new role consisted of implementing organization-wide policies and compliance controls across several standards about which Plaintiff knew nothing. She was to do this working independently and completely isolated, as her staff was reassigned to other projects.

60.     Upon information and belief, Plaintiff was given this assignment in retaliation for her opposing Defendant MindMed's willful violations of the equal pay act and discriminatory employment practices.

61.     In February or March 2022, Defendant MindMed informed Plaintiff that her target bonus for 2021 was reduced from 40% of her salary to 30%. Plaintiff was able to negotiate to keep the 40% bonus for 2021, but VP Klimes changed her target to 30% for year 2022. Upon information and belief, no male employees' bonus targets were reduced. Upon information and belief, Defendant MindMed did not reduce the bonus target for any employees who did not oppose Defendant MindMed's discriminatory compensation practices.

62.     VP Klimes did not follow Defendant MindMed's process for performance evaluations when reviewing Plaintiff's performance. He did not view or consider Plaintiff's self-assessment (a key component of the process), ignored the fact that CBO/CTO Cross promoted Plaintiff in 2021, tried to reduce Plaintiff's target bonus, and ignored the fact that Plaintiff's pay and equity was inequitable.

63.     Moreover, in 2020, Defendant MindMed granted inflation raises of a few thousand dollars to the entire organization. By reducing Plaintiff's target bonus to 30%, Plaintiff's effective compensation was only raised by $250. Thus, Plaintiff was denied an equitable inflation raise.

64.     Plaintiff attempted to discuss these pay inequity issues with VP Klimes on several occasions in 2022. VP Klimes would only ever say that he was working on an equity compensation project to fix past inequities, but never actually did anything.

65.     Most troubling, Plaintiff's performance evaluation did not include the traditional "Growth Plan." Unlike every other Defendant MindMed employee, Plaintiff did not get steps on how to progress in the organization aligned to career trajectory.

**Plaintiff's Employment is Terminated in "Corporate Realignment"**

66.     On December 2, 2022, Defendant MindMed terminated Plaintiff's employment, ostensibly "due to [Defendant MindMed's] decision to align the Business Development and Operations groups with business need." This "corporate realignment" consisted of terminating the employment of two employees: Plaintiff and Male Coworker 2.

67.     Upon information and belief, Defendant MindMed terminated Plaintiff's employment because it did not want to adjust her compensation to make it equitable with men performing jobs of equal skill, effort, and responsibility, performed under similar working conditions.

68.     Further, upon information and belief, Defendant MindMed terminated Plaintiff's employment because she opposed and challenged. Defendant MindMed's willful violations of the EPA, NYEPA, NYSHRL, NYCHRL, and other anti-discrimination laws.

**Respondent MindMed's Pay Inequity Continues Post-Termination**

69.     In the months leading up to Charging Party termination, Respondent MindMed made repeated promises that it was going to "true up" RSU grants to compensate employees whose stock options had lost significant value. This particularly affected long-term employees like Charting Party and Male Coworker 2.

70.     Respondent MindMed finally presented the RSU true-up in December 2022, after it terminated Charging Party's employment, and backdated the vesting date to December 1, 2022 – the day before Charging Party's employment was terminated. Further, Respondent MindMed has refused to reimburse Charging Party for her business expenses incurred before her termination.

71.     Upon information and belief, Respondent granted significantly more RSUs to male employees than it granted to female employees in substantially equal jobs.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Equal Pay Act, 29 U.S.C. 206(d))**

72.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

73.     Defendant MindMed deliberately, willfully, and systematically paid Plaintiff substantially less than it paid male employees performing work requiring equal skill, effort, and responsibility, performed under similar working conditions. Indeed, Defendant MindMed willfully paid Plaintiff less than it paid male employees performing jobs requiring substantially less skill, effort, and responsibility.

74.     Defendant MindMed violated the Equal Pay Act, 29 U.S.C. § 206(d) by paying Plaintiff, a female, substantially less than it paid male employees performing work requiring equal skill, effort, and responsibility.

75.     Defendant MindMed acted willfully. Corporate officers acknowledged that Plaintiff was underpaid and under-leveled, and promised to correct the historical inequity in Plaintiff's compensation, but Defendant MindMed refused to fix the problem and pay Plaintiff an equitable compensation package.

76.     As a result of the foregoing, Plaintiff has suffered monetary damages.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(New York Equal Pay Act, Labor Law § 194)**

77.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

78.     Defendant MindMed deliberately, willfully, and systematically paid Plaintiff substantially less than it paid male employees performing work requiring equal skill, effort, and responsibility, performed under similar working conditions. Indeed, Defendant MindMed willfully paid Plaintiff less than it paid male employees performing jobs requiring substantially less skill, effort, and responsibility.

17

79.     Defendant MindMed violated the New York Equal Pay Act, NY Lab Law § 194, by paying Plaintiff, a female, substantially less than it paid male employees performing work requiring equal skill, effort, and responsibility.

80.     Defendant MindMed acted willfully. Corporate officers acknowledged that Plaintiff was underpaid and under-leveled, and promised to correct the historical inequity in Plaintiff's compensation, but Defendant MindMed refused to fix the problem and pay Plaintiff an equitable compensation package.

81.     As a result of the foregoing, Plaintiff has suffered monetary damages.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Retaliation under the Equal Pay Act and New York Equal Pay Act)**

82.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

83.     Plaintiff engaged in protected activity when she challenged Defendant MindMed's discriminatory compensation practices, including its practice of paying Plaintiff substantially less than male comparators performing work of equal skill, effort, and responsibility, performed in similar working conditions.

84.     Defendant MindMed retaliated against Plaintiff's challenging of its discriminatory compensation practices when it:

    a.   Demoted her from Senior Director to Director;

    b.   Removed her promotion to Chief of Staff;

    c.   Failed to correct historic pay inequity despite repeated promises to do so;

    d.   Changed her job responsibilities to something Defendant MindMed knew she would not enjoy; and

    e.   Terminated her employment.

85.     As a result of the foregoing, Plaintiff suffered monetary damages and severe emotional distress.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Gender and Disability Discrimination in Violation of NYSHRL and NYCHRL)**

86.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

87.     Defendant discriminated against Plaintiff in violation of the NYSHRL and NYCHRL by subjecting Plaintiff to adverse employment actions on the basis of her status as a woman and a person with a disability and/or perceived disability. Defendant discriminated against Plaintiff by refusing to provide Plaintiff with reasonable workplace accommodations, refusing to engage in a cooperative dialogue concerning accommodations, and wrongfully terminating Plaintiff's employment because of gender, disability and/or perceived disability.

88.     Defendant further discriminated against Plaintiff by repeatedly refusing to pay her equitably, demoting her, changing her job to something less desirable, denying her a promised promotion, and scapegoating her

89.     As a direct and proximate consequence of Defendant's discrimination herein alleged, Plaintiff has suffered, and continues to suffer, substantial damages, including but not limited to lost wages, benefits, and other economic loss, severe psychological, mental, physical and emotional distress, harm to employability and earning capacity, disruption to personal life, and other compensable damages.

90.     Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's legally protected rights, entitling Plaintiff to punitive damages.

91.     By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of New York State laws, including the New York State Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Retaliation in Violation of NYSHRL and NYCHRL)

92.  Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

93.  Plaintiff was an employee of Defendant and is protected by the NYSHRL and NYCHRL from retaliation and retaliatory discharge.

94.  Plaintiff complained to Defendant about the gender and disability discrimination to which she was subjected during her employment with Defendant.

95.  Plaintiff's complaints were ignored by Defendant.

96.  Defendant, unlawfully and without cause, retaliated against Plaintiff and/or aided and abetted retaliation against her as a direct result of Plaintiff's complaining about the incidents of gender and disability discrimination.

97.  Because she protested Defendant's unlawful behavior, Plaintiff was subjected to retaliation.

98.  The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of the NYSHRL and NYCHRL, and ultimately resulted in her constructive termination. Defendant knew and should have known about the retaliation and the effect it had on Plaintiff's employment and failed to take any action to stop the retaliatory conduct.

99.  As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to, wages and other benefits due her.

100.  Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, great humiliation, and physical assault, which have manifested in serious emotional distress.

101.    As a further direct and proximate result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

102.    As a result of Defendants' violation of the NYSHRL and NYCHRL, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Defamation)

103.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

104.    Male Coworker 1 falsely stated that Plaintiff made him feel uncomfortable; i.e., that Plaintiff sexually harassed him.

105.    Upon information and belief, Male Coworker 1 published his false statement to multiple third parties, including his and Plaintiff's coworkers.

106.    Male Coworker 1's false statement impugned Plaintiff's professional reputation.

107.    Male Coworker 1 was not privileged to make his false statement.

108.    Male Coworker 1 knowingly made his false statement, with malice and with reckless disregard for the truth.

109.    Male Coworker 1 defamed Plaintiff per se, by making a false statement that impugned her professional reputation.

110.    Male Coworker 1 made his false statement while performing work for Defendant MindMed. Male Coworker 1's making of the false statement fell within the scope of his employment with Defendant MindMed.

111.    Defendant MindMed is legally responsible for Male Coworker 1's false statement that impugned Plaintiff's professional reputation.

112.    Accordingly, Defendant MindMed defamed Plaintiff per se.

113.    As a direct and proximate result of said defamation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

114.    As a result of Defendant's knowing and malicious defamation of Plaintiff, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Breach of Contract)

115.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

116.    Under the terms of Plaintiff's employment with Defendant MindMed, Plaintiff agreed to expend personal funds for expenses she undertook on behalf of Defendant MindMed. In exchange, Defendant MindMed agreed to reimburse Plaintiff for the personal funds she expended for expenses she undertook on behalf of Defendant MindMed upon the presentation of receipts to Defendant MindMed.

117.    Before her employment with Defendant MindMed ended, Plaintiff expended personal funds for expenses she undertook on behalf of Defendant MindMed. She presented receipts to Defendant MindMed, yet Defendant MindMed refuses to reimburse Plaintiff.

118.    Plaintiff, both individually and through counsel, made repeated demands for reimbursement of the personal funds she expended for expenses she undertook on behalf of Defendant MindMed. Defendant MindMed persists in its refusal to pay.

119.    Defendant MindMed breached its contract with Plaintiff by failing and refusing to reimburse Plaintiff for the personal funds she expended for expenses she undertook on behalf of Defendant MindMed.

120.    As a result of Defendant MindMed's breach of contract, Plaintiff has been damaged.

### AS AND FOR AN EIGHTHCAUSE OF ACTION
#### (Unjust Enrichment)

121.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

122.    Plaintiff conferred a benefit upon Defendant MindMed when she expended personal funds for expenses she undertook for the benefit of Defendant MindMed.

123.    Defendant MindMed has failed and refused to fairly compensate Plaintiff for the benefit she conferred upon Defendant MindMed.

124.    Defendant has been unjustly enriched by failing and refusing to fairly compensate Plaintiff for the benefit she conferred upon it.

125.    Plaintiff has been damaged in an amount this Court deems just and reasonable, as equity requires.

### JURY TRIAL DEMANDED

Plaintiff demands a jury trial.

### PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

   a.  Declaring that the Defendant failed to pay Plaintiff an amount equal to what it paid men in jobs requiring equal skill, effort, and responsibility, performed under similar working conditions, and retaliation for opposing unequal compensation practices, in violation of the Equal Pay Act, 29 U.S.C. § 206(d), and New York Equal Pay Act, NY Lab Law § 194;

b.  Declaring that Defendant discriminated against Plaintiff because of her gender and disability and/or perceived disability in violation of NYSHRL and NYCHRL;

c.  Declaring that Defendant discriminated against Plaintiff because she opposed practices that violated the EPA, NYEPA, NYSHRL, and NYCHRL;

d.  Declaring that Defendant defamed Plaintiff per se, causing harm to her professional reputation;

e.  Declaring that Defendant breached its employment contract with Plaintiff when it failed and refused to reimburse her expenses;

f.  Declaring that Defendant was unjustly enriched when it received the benefit of Plaintiff undertaking expenses on its behalf at her own expense and then refused to adequately compensate Plaintiff for the benefit;

g.  Awarding compensatory and punitive damages in an amount to be determined by a jury;

h.  Awarding damages for emotional distress in an amount to be determined by a jury;

i.  Awarding damages for unjust enrichment as equity requires;

j.  Awarding the cost, disbursements and legal fees of this action, interest from the date of the verdict rendered hereon and reasonable attorney's fees; and

k.  Granting such other and further relief as this Court may deem just and proper under the circumstances.

Dated:  New York, New York
        August 24, 2023

Respectfully submitted,

GODDARD LAW PLLC

By: Megan S. Goddard
    Megan S. Goddard
    Frances Codd Slusarz
    39 Broadway, Suite 1540
    New York, New York 10006
    Tel. 646 964-1178
    megan@goddardlawnyc.com
    frances@goddardlawnyc.com